1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                              16 Cr. 207 (KBF)

5   BORIS NAYFELD,

6               Defendant.

7   ------------------------------x

8                                   New York, N.Y.
                                    July 27, 2017
9                                   1:05 p.m.

10

    Before:
11
                        HON. KATHERINE B. FORREST,
12
                                        District Judge
13

14                          APPEARANCES

15  JOON H. KIM
        Acting United States Attorney for the
16      Southern District of New York
    ANDREW M. THOMAS
17      Assistant United States Attorney

18  FRANK TASSONE
        Attorney for Defendant
19

20

21  ALSO PRESENT:  NELLY ALISHAEV, Interpreter (Russian)
                   LUKE HARDISON, FBI
22

23

24

25

1          (Case called)

2          MR. THOMAS:  Good afternoon, your Honor, Andrew Thomas

3  on behalf of the United States.  I'm joined by FBI Special

4  Agent Luke Hardison.

5          THE COURT:  Good afternoon, Mr. Thomas, Mr. Hardison.

6          MR. TASSONE:  My name is Frank Tassone representing

7  Mr. Nayfeld, who is seated to my left.

8          THE COURT:  Good afternoon, Mr. Tassone, and the Court

9  notes that Mr. Nayfeld is here and present in court.  Good

10 afternoon, sir.

11         THE DEFENDANT:  Good afternoon.

12         THE COURT:  We are here for the sentencing of

13 Mr. Nayfeld.  And the way that I typically start these

14 proceedings is by reciting on the record the counts of

15 conviction and also the materials that I have received in

16 connection with this proceeding.  We will also talk a little

17 bit about the guidelines, of course, both the guidelines as

18 they are set forth in the PSR, as well as the more recent

19 submissions on an alternative guidelines calculation that I've

20 received.

21         Mr. Nayfeld pled guilty to two counts, a conspiracy to

22 commit extortion in connection with being asked to arrange for

23 a murder, agreeing with another to extort money from the victim

24 to stop the plot, among other things.  As laid out in the PSR,

25 there are some other pieces of the offense, but that's

1    certainly one of the main pieces.  And then Count Two is the

2    actual extortion, which is the collection or intent to collect

3    payment in connection with that scheme.

4          Now, in connection with those two counts and the

5    sentencing on the conviction on those two counts I received the

6    following:  Two submissions from Mr. Tassone, both dated July

7    26, 2017, a sentencing submission, and then separately also an

8    agreement with the government's alternative guidelines

9    calculation.  I've also received from the government a

10   submission dated July 21, 2017, and then also, in response to

11   the Court's request for an alternative guidelines calculation,

12   a calculation that came in on July 26.

13         I also will note, though, this is part of the papers

14   in this matter.  But I went back and looked at the complaint in

15   this matter as well, which is dated January 15, 2016, to

16   refamiliarize myself with the kind of information that was

17   present at the time of the initial arrest in this matter and

18   prior to the unfolding of the subsequent events which could

19   both alter the guidelines as they were set forth in the PSR and

20   give me a sense as to where things stand if nothing further had

21   occurred in terms of development of information.  If all we had

22   was that which was in the complaint, I wanted to remind myself

23   about the information that was there and get a sense as to the

24   type of information that was there.

25         I've also received a presentence investigation report

1    dated July 21, 2017, and then more recently I received from the

2    government a third piece of paper, which is a statement dated

3    July 27, 2017, which suggests that there needs to be certain

4    alterations in the guidelines calculation and the PSR which

5    would reduce the guidelines in the PSR in certain respects.

6    Essentially, it would decrease the guidelines in the PSR to 78

7    to 97 months.

8              Those are the submissions.  We will get to the

9    guidelines themselves in a moment.  Is there anything else

10   which you folks think I should have which I have not mentioned?

11             MR. THOMAS:  No, your Honor.

12             MR. TASSONE:  No, your Honor.

13             THE COURT:  Then let's go to the guidelines.

14             Mr. Tassone, I know you are traveling in from Florida,

15   but have you had a chance to look at the government's letter,

16   dated July 27, which suggests certain modifications to the PSR

17   relating to the guidelines?

18             MR. TASSONE:  Yes, your Honor.  I concur that that

19   obstruction of justice is inappropriate in this particular

20   case.

21             THE COURT:  That then relates to paragraph 41 and that

22   then also then reduces the guidelines that flow from paragraph

23   41.  There are certain other adjustments which are in certain

24   other paragraphs which relate to or ultimately result in the

25   decrease in the guidelines between 78 and 97 months.  Is there

1    any problem with any of that, Mr. Tassone?

2         MR. TASSONE:  Your Honor, I have questions about a

3    number of positions in the guidelines.  I can go through them

4    now.  I am not too sure if the Court goes through them

5    individually.

6         THE COURT:  Frankly, my view as to the guidelines that

7    are set forth in the PSR is that they are not determinative of

8    my sentence in this kind of case in terms of the PSR because it

9    relates to postproffer conduct.  And so what I tend to do is to

10   look at all of that.  It certainly informs my 3553(a) analysis,

11   but I focus really more on the preproffer guidelines that are

12   the guidelines that were given by the government yesterday and

13   that you had concurred in.  That's really in terms of how the

14   guidelines impact my sentencing decision.  They are certainly

15   relevant in terms of the PSR, but in this kind of case, given

16   the nature of what the defendant has done, in terms of his

17   proffering, I don't really rely upon them to the extent I would

18   otherwise.

19        Let's go through your corrections.

20        MR. TASSONE:  I think that the one that bothers me the

21   most is on page 9, Section No. 45.  The $30 million, while that

22   number may have been mentioned, at the very best, that was the

23   cusp of a hope.  Of course, that increased the guideline level

24   by seven points.  And I submit that the Court should consider,

25   if anything, reducing that to two or three points.

1        THE COURT:  If it was reduced to two or three points

2   let's just play that through.  That would be based upon what

3   dollar amount?  We are looking now, I think, at Section

4   2B3.1(b)(7)(H).  Let's pull that out so we can all be in the

5   same place.

6        Let me also ask, while we are turning to that, one

7   thing that I've been doing is avoiding the use of certain

8   terminology because of the people in the courtroom who I don't

9   recognize.  Is there any reason for me to be avoiding that

10  terminology or are things known?

11       MR. THOMAS:  The government takes no position on that.

12       THE COURT:  Mr. Tassone.

13       Do you want to come to side bar for a moment?

14       MR. TASSONE:  May I, your Honor?

15       THE COURT:  Yes.  Let's come to side bar for a moment.

16       (Page 7 SEALED by order of the Court)

17

18

19

20

21

22

23

24

25

1                    (In open court)

2            THE COURT:  I'm back looking at 2B3.1.

3            The two to three points, if that's what you are

4    talking about, Mr. Tassone, that would bring it down to a loss

5    amount or an intended loss amount of between $95,000 for two

6    points and $500,000 for three points.  Do you have a view as to

7    which one is supported or supportable?  I'd like to hear from

8    the government on this.

9            MR. TASSONE:  Your Honor, if I may, the number

10   mentioned in the PSR was probably spoken about.  But not only

11   my experience has been, but my knowledge of this case is that

12   those numbers were often puffed and blown up in order to seek

13   someone to pursue the collection of those funds.  I don't have

14   a specific number.  I wish I did.  In fact, no money was

15   collected, to my knowledge, or most of the money collected was

16   $20,000, and I am going from recollection here.  But I felt

17   that out of an abundance of caution that the highest increase

18   in level would be subsection D.

19           THE COURT:  So there would be no objection to

20   subsection D, which would be three levels.  That would bring

21   things down by four.  It doesn't dramatically change things,

22   but it brings things from a level 27 there to a level 24 with a

23   criminal history category still of III.  It's 63 to 78 months

24   would be the guidelines as opposed to 78 to 97.

25           Let me hear from the government, Mr. Thomas, from you,

1    on your views on that paragraph 45 objection.

2             MR. THOMAS:  Yes, your Honor.  The government's

3    evidence is from, as the Court has noted, information that

4    wouldn't have been available to the government at the time that

5    this conduct was occurring.  The information that the

6    government has would support a loss intended greater than 9.5

7    million and, thus, under 2B3.1(7)(H) would result in a

8    seven-level increase.  I think the record supports that as a

9    formal matter of guidelines calculation.

10            I take Mr. Tassone's objection to be in the vain of a

11   request for a departure because that amount of money, as

12   reflected in that guidelines calculation, may overstate what

13   was truly possible to collect in the real world.  And so I

14   think the government would encourage the Court to take Mr.

15   Tassone's remarks up in the consideration of a departure or

16   variance.

17            THE COURT:  Here is what I am going to suggest that we

18   do.  I am not going to change the guidelines calculation.  I'm

19   not going to change paragraph 45.  However, I will tell you

20   that my intention is, because of the expected motion by the

21   government, there will be a departure in any event, that that

22   departure will be influenced by a downward adjusted loss level

23   because of the issues that are raised and some of the concerns.

24   So I will take into consideration but I am not going to

25   actually formally change the guidelines calculation.

Case 1:16-cr-00207-KBF   Document 33   Filed 09/22/17   Page 9 of 26

1      I will tell you that my sentence in either event is

2   not going to be driven by this guidelines calculation.  So

3   ultimately this particular probation guidelines calculation is

4   irrelevant to my ultimate determination because I'm not driving

5   my sentence off that.  I'm driving my sentence off of a

6   preproffer guidelines calculation.

7           Are we all OK with that, Mr. Tassone?

8           MR. TASSONE:  Yes, your Honor.

9           THE COURT:  Mr. Thomas.

10          MR. THOMAS:  Yes, your Honor.

11          THE COURT:  The Court does confirm the guidelines

12   calculation as modified by the government in its July 27, 2017

13   letter which brings the guidelines down to 78 to 97 months.

14   But, again, as the Court has already stated, the preproffer

15   guidelines are different from that and the preproffer

16   guidelines are the guidelines that the Court finds most useful

17   in connection with its sentencing today.

18          Those preproffer guidelines are 37 to 46 months, and

19   so they are quite different.  And so the way the guidelines

20   will be reflected in the J&C is as 78 to 97 with a criminal

21   history category of III.  But the guidelines that I am going to

22   be thinking about in terms of the 3553(a) factor include the

23   preproffer, which will be 37 to 46 months, which is an offense

24   level of 19 and criminal history category of III.

25          Mr. Tassone, have you had an opportunity to review the

1    PSR with your client?

2            MR. TASSONE:  Yes, your Honor.

3            THE COURT:  And do you have any other objections to or

4    modifications that you believe need to be made to the PSR?

5            MR. TASSONE:  No, your Honor.

6            THE COURT:  Mr. Thomas, do you have any objections to

7    or modifications that need to be made to the PSR?

8            MR. THOMAS:  No, your Honor.

9            THE COURT:  The Court then does adopt the factual

10   statements in the PSR.  It's not my practice nor would it be

11   appropriate to adopt the sentencing recommendation of the PSR

12   because that's for the Court to determine, but the Court does

13   consider what probation has said, and I have done so here.

14           Let's go on to the next part of the proceeding and let

15   me ask the government if they would like to make any additional

16   statements in addition to those set forth in your papers.

17           Mr. Tassone, after the government has spoken, I

18   typically do it in the order of the government, then the

19   defense counsel, and then let the defendant have the last word.

20           Mr. Thomas.

21           MR. THOMAS:  Yes, your Honor.  The government is of

22   course available to answer any of the Court's questions but

23   would emphasize a few points.

24           First, Mr. Nayfeld is obviously a complicated person

25   with a rich criminal history.  He has for most of his adult

1    life been in Russian organized crime.  He has involved himself

2    in all manner illegal activity.

3           We have come to a point where I think Mr. Nayfeld

4    recognizes that that existence has led him to lose a

5    significant chunk of his liberty.  I understand from defense

6    counsel, for example, that the consequences to his most recent

7    conduct, and specifically his decision to plead guilty under

8    the circumstances that he did, that Mr. Nayfeld has experienced

9    personal loss in the sense that his marriage has ended as a

10   result of the stigma associated with his choices.  I think, as

11   I said, Mr. Nayfeld, is a complicated person.  And one thing

12   that I think should probably figure into the Court's sentence

13   is, of course, his long track record.

14          Another thing that I think would be worth focusing on

15   is Mr. Nayfeld, for his long track record, has been exceedingly

16   careful and complete in accounting for that, in discussing it,

17   in addressing general matters of history, experiences that are

18   of enduring value, probably more than can be recognized at any

19   one point in time because the players in Mr. Nayfeld's world

20   continue their affairs and will surely continue to do that in

21   the future.

22          I think Mr. Nayfeld obviously is an older gentleman,

23   so periods of lengthy incarceration may impact him a little bit

24   more strongly.

25          But certainly what he did in this particular case and

1    to focus on the preproffer information was to take his criminal

2    experience, namely his reputation, and attempt to marshal that

3    in a way to extract monetary payment from somebody under fear

4    of death.  It's outrageous.  It is certainly worthy of

5    punishment.

6         Mr. Nayfeld, I think, recognizes that now.  I think he

7    would be the first and perhaps will tell you shortly that for

8    the longest time, perhaps for his entire adulthood, he didn't

9    know any other way, and I think that left him obviously

10   incarcerated multiple times, but destitute and looking for some

11   way to stay on his feet at the time of the charged conduct

12   here.  Not that he is not completely culpable for his choice,

13   which he made on his own, but it did provide others with an

14   opening to attempt to take his reputation and leverage it to

15   their collective advantage, perhaps in ways that Mr. Nayfeld

16   didn't appreciate at the time.

17        THE COURT:  Let me just ask you, Mr. Thomas, because I

18   understand from the government's submission the support for a

19   departure under 5K1.  So the issue is, for me, is, tell me

20   whether or not the government believes that this individual

21   presents a danger to society.  This individual has been

22   involved in very dangerous activity.  I assume his reputation

23   is not unmerited and that his reputation was built upon his

24   conduct and that there was a reason why he was able to utilize

25   that reputation in a credible manner to try to extract a very

1   significant sum of money from someone who believed they were

2   going to be killed and also to get certain other people to

3   stand down who would otherwise have protected that individual.

4   All of this was sort of marshaling a reputation that I think

5   the question really for the government is, are you folks

6   prepared to have this fellow on the street?

7          MR. THOMAS:  Your Honor, to take the Court's comments

8   in parts, certainly under 5K1.1, he meets, in the government's

9   view, a standard for the departure, which I will formally seek

10  when the Court requests it.

11         With respect to Mr. Nayfeld's continuing danger, I

12  think there are a couple of things to focus on.  One is his

13  age.  At this point he is removed in time and removed in

14  community connection from the persons with whom his reputation

15  is most meaningful, both to others and to him.  And so I think

16  perhaps we are at a moment where the reinforcing cycle of the

17  myth of Boris Nayfeld has probably reached its end.  And I

18  think he at this point would be unlikely and perhaps unable,

19  even if he wished to, to take his reputation and turn it into

20  something else.  At this point, as the Court noted,

21  Mr. Nayfeld's decisions in this particular case are noted by

22  the community.  So his status, I think, has changed as a result

23  of his decisions here.

24         THE COURT:  It's the second time, right?  This is not

25  the first time.  As a practitioner recently said to me, this

1     kind of plea is not a car wash for the soul.

2          MR. THOMAS:  An apt description.

3          THE COURT:  Not the language that I would use, but it

4     stuck with me.  Sometimes people engage in behavior that allows

5     the government to stand up, as you are doing, and support

6     certain applications.  But it may or may not mean that the

7     person is any less dangerous than they are were the day before.

8          The question really for you is, Mr. Thomas, are you

9     comfortable?  I'm assuming if you're comfortable, then the

10    special agent is comfortable.  The question is, if you tell me,

11    you guys know a lot more about this than I do, that you're

12    comfortable, that's very meaningful to me.

13         MR. THOMAS:  Of course, the government isn't asking

14    for any particular or precise sentence, but I sincerely believe

15    that Mr. Nayfeld has ended his involvement in these affairs.  I

16    think partly that's a function of the opportunities will no

17    longer be there to present themselves.  Mr. Nayfeld needs to

18    find a way to get on his feet in a lawful manner.  I think

19    hopefully he will describe for you what it is that he intends

20    to do in the future, but I think he's in a situation where the

21    temptation is now gone and at a place where he has sincerely

22    recognized that his past choices, including his past relapse,

23    has put him in a bad and punishment-worthy situation.  Yes,

24    your Honor, I'm comfortable.

25         THE COURT:  Mr. Tassone.

 1          MR. TASSONE:  Your Honor, I have a number of comments

 2   to make, but if I can tag onto the question that the Court

 3   asked counsel.  I think that the events that have occurred

 4   since Mr. Nayfeld's arrest in January of 2016 that included

 5   both publicity about his arrest and the offense charged and

 6   also any information that the community may have and had known

 7   about the adjournment of sentencing for a significant period of

 8   time, I think that as a result of those, I think Mr. Nayfeld is

 9   foreclosed, even if he wanted to, to participate in activities

10   that he has participated in before.  I think he has been shut

11   out by the community, both sides of the community, and I'll

12   have a little bit more to say about that in a second.

13          Your Honor, I was going to ask until I learned that

14   the Court would only allow victims to testify.  But in the

15   courtroom is Mr. Nayfeld's son, Elly.  Elly lives at home with

16   his mother, Mr. Nayfeld's wife.

17          THE COURT:  Which one is Elly?

18          Welcome.

19          MR. TASSONE:  I have learned this over a period of the

20   last several months.  A number of people in the community

21   stopped speaking with, talking with, associating with either

22   Mrs. Nayfeld or Elly because of the arrest.  Subsequent to

23   that, because of information that was circulating within the

24   community, and I think from the news media, I am not too sure

25   how, another subsection of that community will not deal with

1   either Elly Nayfeld or Mrs. Nayfeld.  I know specifics about

2   that because I've been told that.  But it's the majority of

3   people that will have no contact because they stand on either

4   side of the decisions that were made.

5          Mrs. Nayfeld had said for at least a year that she is

6   going to seek a divorce.  She certainly is separated not only

7   physically from her husband, but certainly whatever friendship

8   or familiarity they had has waned significantly and Elly is

9   essentially the only family lifeline that Mr. Nayfeld has now

10  to keep contact with.  Elly himself is dealing with a situation

11  in the other part of the family where the grandmother, as a

12  result of some imperfect or improper surgery, became blind.  He

13  is one of the caretakers for that.

14         If I can address some other issues, your Honor.  I am

15  sure the Court is aware that doing time or spending time in a

16  correctional facility is much more difficult than doing time in

17  the federal prison system itself.  At least I have found that

18  to be the case and other courts have found that to be the case.

19  The individual is not allowed as much freedom.  There is more

20  contact with all sorts of people.

21         This particular case was unusual in the 40 plus years

22  that I've been practicing law.  There are at least 11 to 13

23  meetings that occurred, which is if not the highest number of

24  meetings that occurred with regard to activities, certainly one

25  of the top two.  I think the Court should take into

 1    consideration the circumstances of Mr -- I'm not pursuing this

 2    and I don't intend to make it an issue.  I have spent the last

 3    20 years doing postjudgment death penalty work and it just

 4    always rings a bell.  He had less than a happy childhood.  I

 5    don't know what effect that has.  I just ask the Court to

 6    consider that.

 7            Mr. Nayfeld was living on a Social Security benefit I

 8    think of $750 a month.  He was attempting to seek employment.

 9    He was turned down a number of times.  He was poor, not only in

10    spirit, and I like the word the government used, destitute, but

11    I think he was destitute not only with regard to the true

12    meaning of the word, but also in spirit and in hope.  And that

13    allowed him to willingly be used as -- I am not going to say a

14    pawn, but to be used for the incident that occurred.

15            I think the Court should take into consideration that

16    in the 5K letter that Mr. Nayfeld had no intention of arranging

17    anything, at least by his own statements, with regard to

18    Mr. Potik.  Mr. Potik and he, for whatever reason, didn't get

19    along well and that was a major decision that Mr. Nayfeld made

20    well in advance of the subsequent events.

21            I think that the government agrees that Mr. Nayfeld

22    was forthcoming, truthful, he has kind of an excellent memory,

23    can distinguish most of the time between what was heard in the

24    community and what he himself knew.  Oftentimes it was

25    difficult to control him from bleeding one section into the

 1   other, but the government agents did that well.  the government

 2   was able to look at cellular records, perhaps the instruments

 3   themselves and any recordings that were made.  Mr. Nayfeld has

 4   expressed to me his awareness of and remorse for the serious

 5   offenses that he committed.

 6        Like I said, the only contact he has with the family

 7   now, because he has not gotten along for sometime with other

 8   family members that are distant to him, is Elly who is sitting

 9   in the courtroom.

10        I would ask the Court to adopt the guidelines and make

11   its decision based on that.  They were presented by the

12   government, call them the alternative guidelines or at least to

13   depart as a result of the 5K1 letter and Mr. Nayfeld's actions

14   since his arrest.

15        THE COURT:  Thank you, Mr. Tassone.

16        Mr. Nayfeld, would you like to address the Court

17   before sentence is imposed?

18        THE DEFENDANT:  Yes.  I would like to apologize to

19   everybody who I did hurt.  Maybe I don't have a long time to

20   live because after 70 I can go any time.  If it's possible,

21   just to die at home.  And, again, I apologize for my

22   participation in this matter.

23        THE COURT:  Thank you, sir.

24        In this kind of situation let me describe how the

25   Court's sentencing considerations differ from other situations.

 1    I always have to look at the guidelines.  I've done that.  The

 2    guidelines are advisory only.  In this kind of situation I look

 3    at the guidelines, essentially given the information that we

 4    knew of at the time the arrest was initially made, and then I

 5    look at how they developed the guidelines changed or altered

 6    over time as additional information was acquired.  And I want

 7    to ensure that the defendant is not here penalized for the

 8    increase in the guidelines.

 9         On the other hand, I do need to take into

10    consideration conduct of which I'm aware under 3553(a).  But

11    I've got to balance the need to ensure that the government has

12    the tools in its toolbox that it needs to have in order to

13    continue to prosecute the crimes that it prosecutes.  So I

14    weigh all of that together in terms of the guidelines.

15         With that said, ultimately, even though the Court does

16    grant the motion by the government for a departure under 5K,

17    granting that departure does not necessarily mean a particular

18    sentence, it certainly not what we call a get-out-of-jail-free

19    card and it's not something that erases the criminal conduct.

20    The Court still needs to consider carefully the 3553(a)

21    factors.

22         Just before I get to the 3553 factors, I am not going

23    to dwell on it, but I do find that each of the elements of 5K1

24    have been met.  I have no reason to disagree with the

25    government's factual statements that are set forth in their

1    submission.  I am not going to second-guess that.  Therefore, I

2    granted that motion.

3          I look at the various 3553(a) factors and I think

4    about the seriousness of the offense, the nature and

5    circumstances of the offense, and the history and the

6    characteristics of this defendant, including all of his

7    postarrest conduct, and I weigh all of it together to come up

8    with what an appropriate sentence is.  I'm looking for a

9    sentence that is sufficient but not greater than necessary and

10   that takes into consideration the postarrest conduct.

11         And so let me circle back to the various 3553(a)

12   factors.  This, in my view, was a very serious offense.  You

13   folks undoubtedly know more about the facts of the case than

14   the Court does.  What I have before me in terms of the

15   submission indicates that Mr. Nayfeld has led a life which has

16   enabled him, as I've already previewed, to have a reputation

17   for credible violence and that he was able to capitalize on

18   that in terms of being approached for a murder for hire,

19   effectively, which he then turned into an extortion scheme.

20         Any way you look at this, this is a situation where

21   the Court views the individual who was credibly able to turn

22   that initial hiring into an extortion situation, I look at him

23   as a potentially very dangerous man.  I think that, in my view,

24   I don't have any basis to believe, apart from argument, that

25   the postarrest conduct is more than a very reasonable strategic

1    decision by the defendant to do that which one would do to get

2    out of jail in a reasonable period of time.  I don't

3    necessarily see it as a situation where there has been a change

4    of personality.  I just don't know.

5         So what I have to do as the representative of society

6    is to make a judgment about all of the various factors, how

7    dangerous I think Mr. Nayfeld is, despite his age, also about

8    the benefits that are appropriately recognized, and to credit

9    what the government has said in its submission.

10        And when I weigh all of that I do believe that a very

11   significant departure is appropriate, but I will tell you, I do

12   this with some hesitation because I am concerned that in this

13   situation there is a real tension between giving the government

14   the tool for the toolbox and placing somebody in our community

15   who may not be dangerous to me or to you, but could well and

16   truly be lethal to someone else.  I am mindful of that, so I

17   proceed with great caution.  And I ask the government, I hope

18   it keeps a very close eye on this situation.

19        With all of that said, all of the factors under

20   3553(a), I do believe that there is credit appropriate and that

21   what I will do in this situation is take what is 50 percent of

22   the high end of the guidelines as adjusted for the preproffer

23   guidelines.  That is 50 percent of 46 months, which is a

24   23-month sentence.

25        Mr. Nayfeld, I pronounce that you shall remain in the

1   custody of the United States Marshals for a period of 23 months

2   with credit for the time that you've already served.  You've

3   already served approximately, I think, 18 and a half months of

4   that period of time.  You will get credit for that time.  So

5   there is not much time left for you to serve, but there is a

6   period of time for you to continue to serve, what I am going to

7   call a stub period.  The Bureau of Prisons will calculate the

8   time.  I'm not calculating the time here.  I don't purport to

9   do that.  The Bureau of Prisons will do that.  A 23-month

10  sentence I think appropriately balances the 3553(a) factors

11  along with the credit that is appropriately due and to provide

12  the government with the tools for its toolbox.

13          That, in the Court's view, is the sufficient but not

14  greater than necessary sentence under these circumstances.  I

15  said before, and I just want to reiterate, that I do this with

16  some discomfort.  In a number of situations I don't have the

17  level of discomfort that I have here, but I have discomfort

18  here.  This sentence is driven by the government's position,

19  which is why, Mr. Thomas, I wanted you to stand up and say in

20  open court that you're comfortable with essentially me doing

21  this because I'm relying upon the experience that you have with

22  this gentleman, in part, in making my determination.

23          I also believe that there should be a period of

24  supervised release, though I would suggest that here supervised

25  release is less likely than in many cases to actually catch the

1    kind of conduct that you would be seeking to catch.  I don't

2    expect that Mr. Nayfeld is going to engage in drug crimes or

3    something of that nature.  I think that's not what we are

4    looking at, so I don't think we are going to get dirty urine

5    tests or things like that, which would be the run-of-the-mill

6    violations of supervised release.  I don't expect the period of

7    supervision will be very eventful.  Nevertheless, I do impose a

8    three-year period of supervised release.

9           It's a 23-month period of incarceration in total with

10   credit for time served, reduced by the credit for time served,

11   and a three-year period of supervised release.

12          There will be certain mandatory conditions that

13   Mr. Nayfeld will be subject to.  He cannot commit another

14   federal, state, or local crime.  He cannot illegally possess a

15   controlled substance.  I am going to waive the drug testing

16   condition because he presents such a low-level risk for drug

17   use.  He can't possess a firearm or other destructive device

18   and he has to cooperate in the collection of DNA.  There will

19   be certain standard conditions that will be imposed and certain

20   special conditions.  Mr. Nayfeld shall provide the probation

21   office with any requested financial information and submit his

22   person, vehicle, and place of residence and business to

23   searches as reasonably requested by probation.

24          I believe, Mr. Nayfeld, is a naturalized citizen.  Am

25   I correct about that?

1          MR. THOMAS:  Yes, your Honor.

2          THE COURT:  I don't believe that there will be any

3    immigration consequences, but he should obey all directives of

4    the immigration authority.  He is to report to the nearest

5    probation office within 72 hours of his release from custody

6    and will be supervised in his district of residence.

7          There are two counts, so there is a mandatory special

8    assessment of $200, which is due and payable as soon as

9    practicable.  I don't believe Mr. Nayfeld has the resources to

10   pay a fine, so I don't impose a fine and there is no

11   restitution to be paid.  I do ask the government whether or not

12   under these circumstances, since there was an amount paid,

13   whether or not there is a forfeiture.  I don't believe that

14   there is anything that remained of any property or proceeds

15   traceable to the offense.  But I think there was one check, but

16   he may have been apprehended immediately after receipt of the

17   check.

18         MR. THOMAS:  The Court recalls correctly, the check

19   was never cashed.

20         THE COURT:  There is no forfeiture.

21         Let me ask counsel, do you have any legal or another

22   reason why sentence should not be imposed as stated?  Mr.

23   Thomas.

24         MR. THOMAS:  The government would just ask the Court

25   to clarify that the sentence runs concurrently on both counts.

1        THE COURT:  The sentence does run concurrently on both

2   counts.  It's the same sentence for each of Counts One and Two

3   to run concurrently, both in terms of the period of

4   incarceration as well as the period of supervised release.

5        Mr. Tassone, anything from you?

6        MR. TASSONE:  No, your Honor.

7        THE COURT:  The Court does impose the sentence as

8   stated.

9        Are there any open counts?

10        MR. THOMAS:  There is an underlying information, your

11   Honor.  The government moves to dismiss it.

12        THE COURT:  Did he come in on an information or did he

13   come in on an underlying information?

14        MR. THOMAS:  Information, your Honor.

15        THE COURT:  Any underlying information or counts that

16   may exist, they are dismissed.

17        Mr. Nayfeld, you have a right to appeal.  Any notice

18   of appeal must be filed within 14 days of the filing of the

19   judgment of conviction.  I would expect that judgment would be

20   filed tomorrow or Monday, but your lawyer should follow the

21   docket if you would like to appeal to ensure that you've got

22   the appeal timely filed.  If you cannot afford the costs of

23   appeal, you can apply to have those costs waived.  That's

24   called proceeding in forma pauperis and you have a right to

25   apply to proceed in that manner.

1          Is there anything else that we should do at this time?

2          MR. THOMAS:  Nothing from the government, your Honor.

3          THE COURT:  I need you to talk to Joe afterwards about

4    some of the logistics, Mr. Thomas, in terms of how we are going

5    to get the J&C done because of the way in which the original

6    information was filed.  You will deal with Joe on the logistics

7    of that.  As soon as you do that, I can get the J&C entered.

8          MR. THOMAS:  Yes, your Honor.

9          THE COURT:  Anything else from you, Mr. Tassone?

10         MR. TASSONE:  No, your Honor.

11         THE COURT:  My view, I believe this will be the case,

12   is that Mr. Nayfeld will probably not be changed in terms of

13   the location of his housing because the period that he remains

14   to be served is so short that I assume he will just stay where

15   he is right now.  If there is any change to that and you need

16   to make any applications, let me know in the future, but I

17   would assume they are not going to bother to move him.

18         MR. TASSONE:  Yes, your Honor.

19         THE COURT:  Thanks.  We are adjourned.

20                             o0o

21

22

23

24

25